# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

DEBORAH DAVIS,                          )
                                        )
    **Plaintiff,**                 )
                                        )
    **vs.**                       )          **Case No. 4:05CV2410MLM**
                                        )
JO ANNE B. BARNHART,                    )
Commissioner of Social Security         )
    **Defendant.**                 )


## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne B. Barnhart ("Defendant") denying the application of Deborah Davis ("Plaintiff") for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§1381 et seq. Plaintiff has filed a brief in support of her Complaint. Doc. 17 Defendant has filed a brief in support of the Answer. Doc. 18 The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c). Doc. 7.

## I.
## PROCEDURAL HISTORY

On November 9, 2004 Plaintiff filed an application for disability benefits alleging a disability onset date of October 1, 1996. (Tr. 84-88). Plaintiff's application was denied.[1] (Tr. 72-76). Plaintiff filed a request for a hearing, which was held before Administrative Law Judge J. Pappenfus on June

---

[1]    Missouri is one of several test states participating in modifications to the disability determination procedures which apply in this case. 20 C.F.R. § § 404.906 and 404.966 (2002). These modifications include, among other things, the elimination of the reconsideration step and at times, the elimination of the Appeals Council review step in the administrative appeals process. See id. Therefore, Plaintiff's appeal in this case proceeded directly from her initial denial of benefits to the administrative law judge level.

14, 2005. (Tr. 21-50). On August 19, 2005 the ALJ issued a decision which was unfavorable to Plaintiff. (Tr. 12-20). On September 16, 2005, Plaintiff filed a request for a review of the ALJ's decision with the Appeals Council. (Tr. 7). On December 8, 2005, the Appeals Council denied Plaintiff's request for review. (Tr. 2-4). Thus, the decision of the ALJ became the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

Plaintiff testified that she lived in an apartment with her husband; that she has a GED; that she had training as a hair stylist/beautician; that she started working as a hairstylist in about October 1990; that she worked in this capacity until about April 1991; that, at least fifteen years prior to the hearing, she worked for Head Start as a teacher's aide; that she does not have any training as a teacher; and that as a teacher's aide she read books to preschoolers. (Tr. 25-30).

Plaintiff further testified that she is a certified nurse's aide; that she completed training to become a substitute school nurse; and that she does not have a LPN or a RN license. (Tr. 26-27). Plaintiff stated that she worked at Jefferson Memorial Hospital from August 1996 until December 1998; that she worked full-time as a nurse's aide at Jefferson Memorial Hospital; that she also worked as a monitor technician at Jefferson Memorial Hospital; and that as a monitor technician she watched monitors and recorded the monitor's findings. (Tr. 29-31). Plaintiff testified that she began working as a substitute school nurse around September 2001 or September of 2002; that she worked in this capacity on an as needed basis; and that she stopped working as a substitute nurse in October 2004. (Tr. 27-28).

Plaintiff testified that she also worked briefly as a part-time receptionist in a chiropractic office; that she worked there sometime within eight years of the hearing; and that she stopped

working as a receptionist when "it got to where [she] was just having too much problems being able to sit for very long." (Tr. 28).

Plaintiff stated that on October 1, 1996, she first experienced stabbing pain in her thigh when she was at her mother's bingo club and that she managed to work for short periods of time after that date. (Tr. 49). Plaintiff further stated that while working as a nurse's aide the most weight she lifted with another person was probably 100 pounds; that as a nurse's aide she might turn someone over from side to side or help get someone out of bed and into a chair, that as a nurse's aide she did not lift more than twenty or thirty pounds by herself; and when she was a monitor technician the only lifting she did was to lift patient charts. (Tr. 30-31).

Plaintiff testified that her major complaint is daily and constant pain in her left leg, lower back and her feet; that she has pain in the middle of her lower back and across her lower back; that the pain radiates to her left leg and down to her feet; that her feet turn very red and burn; that when her feet burn she can not put them on the floor and walk; and that sometimes the pain is unbearable. Plaintiff further stated that she has some good days and some bad days; that when the pain is extremely bad she spends most of the day lying down; that the pain varies in intensity; that in the two months prior to the hearing she noticed the pain was greater in her left leg than her right leg; and that sometimes the pain is so bad that she can not fall asleep at night even with pain medications (Tr. 32-35, 37-38). On a scale of one to ten Plaintiff rated her pain as a six and stated that the pain can get worse than a six and that four days a week the pain is at "a ten or better." Plaintiff's attorney then explained to her that "ten" is the point at which one would need to go to the hospital, and Plaintiff then changed the assessment of her pain to a "nine." (Tr. 35). Plaintiff said that if she increases her pain medicine the pain becomes a little more manageable; that her activities are more limited on the days she has severe pain; and that she spends most of the day lying down when she has a bad day. (Tr. 35-37).

Plaintiff testified that she can bend over to a certain point; that she feels pain in her back which forces her to stop bending; and that she has to stoop down and get up very slowly. (Tr. 38).

Plaintiff testified that at the time of the hearing she weighed 214 pounds; that she is 5'2" tall; that she used to weigh 222 pounds; that her doctors had not spoken to her about her weight; that before her medical problems occurred she weighed around 160 to 164 pounds; and that she gained weight because she was not as active. (Tr. 38-39). Plaintiff also testified that the main street in her town is not far from where she lives and that she can drive to the store and back; that she does not drive for more than ten to fifteen miles; that when traveling lengthy distances she has someone drive her; that her sister drove her to the hearing; that she can go to the grocery store to buy "milk or bread or something"; that she does not shop for a week's worth of food by herself because she can not carry that many groceries; that she can lift and carry about twenty pounds across a room; that she can carry a light bag of groceries into the house; that she could probably carry a twenty pound bag of potatoes and that it would be painful for her; and that she could probably carry groceries weighing about ten to twelve pounds without this being painful for her. (Tr. 38-40).

Plaintiff stated that she takes care of her personal needs; that she plays bingo at a bingo hall; that sometimes she has problems sitting through the games and has to stand up while playing; that her bingo games are three to three and a half hours long; that she plays bingo twice a month; that she can not dance because it is painful; that she was "not much into dancing"; and that on a typical day she watches television in bed for about four hours.(Tr. 40-41)

Plaintiff testified that she is up and down several times throughout the night; that her sleep is not a steady; and that most of the time the burning in her feet is the source of her sleeping problems. (Tr. 42). When asked what caused the burning sensation in her feet, Plaintiff testified that one doctor told her it was "one of those idiopathic things we cannot explain, and I'm not going to

sit here and deny it"; that another doctor told her that she wore her underwear too tightly; that some doctors told her the pain was from an injury which they could not identify; and that the doctors did not have any idea from where the pain originated. (Tr. 43). Plaintiff further stated that she has had CAT scans, a nerve conduction study test, and MRIs in regard to the problem with her feet; that she has had cortisone injections in her feet and in her hip; and that doctors have checked her for sciatic nerve problems. (Tr. 42-43).

Plaintiff further testified that at the time of the hearing she was not receiving medical treatment for her back; that she had not been able to go to a doctor recently because she did not have insurance; that her husband just recently received insurance through his work; that since her husband's insurance went into effect she has made appointments; that she saw a chiropractor; that she did not get any relief from the chiropractor; that the chiropractor told her that she had problems with her lower back; that the chiropractor told her if "things weren't fixed properly ... it could cause me to be in a wheelchair within five years"; that the chiropractor wanted Plaintiff to continue to see her; and that Plaintiff did not have insurance or enough money to pay for more office visits to the chiropractor. (Tr. 43-44).

Plaintiff testified that the only prescription medication she was taking at the time of the hearing was Darvocet; that her dentist prescribed Darvocet for pain in her jaw after some dental work she had about four weeks prior to the hearing; that Plaintiff was also taking the Darvocet for her back pain; that she had not been prescribed this medication for her back pain; that her medical doctors were unaware she was taking Darvocet because she had not seen any of her doctors since she had the dental work; that she was not taking Darvocet or any other prescription medications prior to seeing the dentist; and that prior to seeing the dentist she had not taken any other prescription medications since sometime around August of 2004. (Tr. 45-46). Plaintiff also testified that Dr. Winterberger had

prescribed Neurontin and Darvocet for her; that she saw Dr. Winterberger twice; that she did not have the money to continue seeing Dr. Winterberger; and that once she canceled an appointment because she did not have the money to pay for the visit. (Tr. 46-47).

When the ALJ asked Plaintiff if she was alleging any mental impairments, Plaintiff responded that she was depressed and cried a lot because of her pain; that she did not believe she was "a mental case"; that she had never been to a psychiatrist "or anything like that"; that about five or six years prior to the hearing Michael Patterson, D.O., put her on Zoloft for about four months for depression; and that she stopped taking the medication because she ran out and "he just thought [she] would just do it without it so [she] did." (Tr. 48).

## III.
## MEDICAL RECORDS

A "Combined Nerve Studies" and "Needle EMG Examination Report" dated February 20, 1998, states that Plaintiff had a history of pain in her left leg; that the nerve conductions and EMG of her left leg were normal; that there was no indication of lumbar root lesion; and that the distribution of pain and numbness suggested entrapment at the injuinal ligament. (Tr. 189-190). An "Interim Report" dated April 19, 2002, states that an "ANA Screen"Test was negative. (Tr. 191).

A "Nerve Conduction Studies Report" and "Electromyography Report" dated April 22, 2002 states that Plaintiff's legs and feet had normal nerve conductions and EMG studies. (Tr. 193-194).

In a letter dated April 24, 2002, Richard A. Head, M.D., reported that he saw Plaintiff on a return visit for EMG and nerve conduction studies; that Plaintiff's nerve conduction studies of both lower extremities were well within normal limits with no evidence of neuropathy or entrapment at the knees or ankles; that an EMG looking for denervation from neuropathy or lumbar radiculopathy was normal; that he thought Plaintiff was responding well to and tolerating amitriptyline prescribed to help her sleep at night; and that Plaintiff would return in about three weeks. (Tr. 194).

In a second letter dated also April 24, 2002, Dr. Head reported that he saw Plaintiff regarding burning feet; that she complained of backache and burning pain and numbness in the thighs bilaterally; that she denied weakness in her legs; that Plaintiff first reported that the pain was bad for about one year and she later said she had this problem for about five years prior to seeing Dr. Head; and that besides hypertension and this lower extremity problem Plaintiff's past medical history was unremarkable. Dr. Head further reported that Plaintiff said that she was taking two Darvocet and a "couple of Aleve" to ease the pain and help her sleep and an over-the-counter medication called Unisom; that sometimes her feet turned red and were cool to the touch; that around the time her pain started she experienced an injury to a sciatic nerve to the left from a needle stick; that she was seeing a chiropractor for this pain; that she stopped working a few years prior to Dr. Head's examination due to the pain; that she had never been on any other treatment such as tricyclics, or Neurontin for the pain; and that she had no history of diabetes. (Tr. 196).

Dr. Head's second letter of April 24, 2002, also states that Plaintiff was overweight; that she was awake, alert, attentive and oriented; that her speech was fluent and appropriate; that she followed commands appropriately; that her cranial nerve testing showed that her visual fields were full; that Plaintiff's extraocular movements were intact; that her pupils were round and reactive to light with flat discs; that her face was symmetrical to movement and sensation; that her hearing was intact; that her tongue and palate moved normally and in the midline; that motor testing revealed 5/5 strength, normal coordination, and normal gait; that her reflexes were obtainable at both knees at 1+; that her reflexes were "1+ to 2+" at her ankles; that Plaintiff had "downgoing toes"; that there was a loss of pin sensation in the anterior lateral thigh distributions bilaterally; and that Plaintiff's lower back was supple without straight leg raising signs. (Tr. 195-96).

Dr. Head's impression was that Plaintiff had some clinical features of a neuropathy with a decreased pin sensation; that Plaintiff had reflexes which tended to negate a finding of neuropathy etiology; that Plaintiff's "anterior lateral thigh discomfort of numbness and pain [was] a fairly typical distribution of entrapment of the anterior lateral cutaneous nerves of the thighs at the inguinal ligaments"; that he would defer a treatment of local Marcaine, Lidocaine and steroid injection until he could get a better idea of "what was going on with her"; that he would repeat blood work; that Plaintiff would return in one week for nerve conduction studies; that he would review the previous studies; that he would also conduct EMG's of Plaintiff's legs to evaluate for potential radiculopathy; that he prescribed amitriptyline for Plaintiff at night; that he hoped Plaintiff would use less Darvocet upon starting the amitriptyline; and that she could increase the dosage of amitriptyline at night when sedation was not a problem. (Tr. 195).

In a letter dated July 17, 2002, Dr. Head stated that upon a return visit to St. Anthony's Medical Center, Plaintiff complained of increased burning pain in her feet up to her ankles; that her strength was normal; that she complained of redness; that Dr. Head did not appreciate redness during the exam; that Plaintiff had 2+ reflexes in her ankles which were absent at her knees; that a pin sensation was subjectively decreased up to her mid calf; that 50 milligrams of amitriptyline at bedtime was not helping Plaintiff; that Plaintiff's blood work had not revealed a cause for any type of neuropathy; that Dr. Head was prescribing her Neurontin; that if Plaintiff tolerated Neurontin, if needed, he could increase the dosage; and that Plaintiff would return in one month. (Tr. 187).

On February 19, 2003, Plaintiff visited the emergency room at Jefferson Memorial Hospital with complaints of a left leg injury. (Tr. 177-179). Emergency room records of this date reflect that Plaintiff had a strain at the left knee medial collateral ligament; that Plaintiff fell and twisted her left knee; that she had pain on medial stress; that Plaintiff had an antalgic gait; that an x-ray showed an

irregularity of the left medial condyle; that she was awake and alert; that her sensations were intact; that her motors were intact; that there was no vascular compromise; that she was oriented times three; that her mood and affect were normal; and that her skin was warm and dry. (Tr. 177-179). Plaintiff was discharged and given prescriptions for Vicodin and ibuprofen and was given a knee immobilizer. (Tr. 177, 179).

A "Medical Imaging Report" from Plaintiff's February 19, 2003 visit to Jefferson Memorial Hospital states that there was a slight irregularity of the condylar surface at the medial interface of the patella with the medial femoral condyle; that this was of uncertain significance in the absence of a joint effusion; that the irregularity might represent a small area of notching; that an impaction deformity could not be entirely excluded; that there was no other focus of abnormal bone texture; and that there were no subluxations, joint effusions or any other abnormalities. (Tr. 180).

Rene Winterberger, D.O., saw Plaintiff as a new patient on October 4, 2004. (Tr. 146-147). Dr. Winterberger's notes of this date reflect that Plaintiff complained of numbness along the lateral side of her left thigh; that this numbness began eight years ago as a sharp mid thigh pain while walking; that Plaintiff had numerous nerve conduction tests and MRI's with no conclusive diagnosis; and that her most recent examination was within the past year. Dr. Winterberger's notes of this date further reflect that Plaintiff also reported extreme burning in her feet on a daily basis for about eight years; that her feet turned red but felt cool to the touch; that her feet were worse at night; that on one occasion the pain was so bad that she considered cutting her feet off; that she was depressed about her condition and her inability to lose weight; that "no one ha[d] ever tried to treat her pain." (Tr. 146). Dr. Winterberger's records further reflect that Plaintiff's prescription medication included Lisiniopril, Levoxyl, and Elmiron and that she was taking over-the-counter medication including Melatonin, Sleepaid, and two an acid reflux medications. (Tr. 146).

Dr. Winterberger reported, upon examination, that Plaintiff was five feet two inches tall and weighed 218 pounds; that her blood pressure was 145/97; that her cranial nerves were grossly intact; that her deep tendon reflexes were +2/4 and equal bilaterally in all extremities; that Plaintiff had no motor or cerebellar deficits; that her extremities had no erythema, edema, cyanosis or clubbing; that her feet were cool to the touch; and that her pedal and radial pulses were +2/4 and equal bilaterally. (Tr. 146-147). Dr. Winterberger's impression was paresthesias of the left leg, foot pain with unclear etiology, morbid obesity, hypertension, and hypothyroidism. Dr. Winterberger instructed Plaintiff to return for a follow-up in three weeks. (Tr. 147).

On November 8, 2004, Plaintiff returned to Dr. Winterberger. Dr. Winterberger's notes of this date state that Plaintiff reported that she still had pain in her legs and feet; that Ultram no longer helped; that her heart raced sometimes; that her heart raced on November 6, 2004, for about three minutes and her pulse rate was 160; that the heart racing was not accompanied by chest pain; that her hands and arms tingled and felt heavy before the heart racing; that the heart racing took place when she was at rest; that she could not eat due to the pain; and that she no longer had insurance and was seeking disability. Upon examination Dr. Winterberger reported that Plaintiff's blood pressure was 147/82; that she had a regular heart rate and rhythm without murmurs or ectopy; that her cranial nerves were grossly intact; that her deep tendon reflexes were +2/4 and equal bilaterally in the lower extremities; that she had no motor defects; and that her muscle strength was +5/5 and equal bilaterally in the lower extremities. (Tr. 149). Dr. Winterberger's impression was paresthesias of the left leg, bilateral foot pain, morbid obesity, hypertension, and hypothyroidism. Dr. Winterberger's notes state that Plaintiff should go to a urology clinic; that she was prescribing Neurontin, Darvocet and Lexapro for Plaintiff; that she suspected Plaintiff's palpitations were due to depression; that if the palpitations

continued, she would conduct a cardiac workup; and that Plaintiff should return to the clinic in one month. (Tr. 149).

A radiology report of views of Plaintiff's lumbosacral spine dated November 29, 2004, states that the vertebral bodies appeared to be normally aligned without any fractures, dislocations or bony destruction; that the disc spaces were well maintained; that the sacroiliac joints were patent bilaterally; that a single view of the pelvis displayed no fractures, dislocations or bony destruction; and that no fractures were observed in any of the views. (Tr. 168).

A November 29, 2004 radiology report of a gallbladder sonogram states that Plaintiff had a history of pain in the right upper quadrant and lower right abdomen and a history of nausea and vomiting; that her gallbladder was partially contracted resulting in a slight thickening of the wall; that no wall edema or cholelithiasis was evident; that the common bile duct was nondilated and approximately .4 cm in diameter; that difficulty penetrating the liver suggested diffuse fatty infiltration; that there were no other abnormalities of the liver, spleen, pancreas, kidneys, or upper abdominal aorta; and that besides suspected mild fatty infiltration of the liver, the test was otherwise within normal limits. (Tr. 170).

On January 10, 2005, John S. Rabun, M.D., of the West Park Medical Clinic, saw Plaintiff for a "Neuropsychiatric Evaluation." (Tr. 153-156). Dr. Rabun's records of this date state that Plaintiff was a fifty year old married and unemployed female; that she stated that she could cry easily sometimes and that she had hot flashes and sleeping problems due to the burning in her feet; that Plaintiff did not relate any thoughts of hopelessness or worthlessness; that she did not endorse any negative thoughts about herself; that she did not report changes in energy or appetite; that she had never been treated by a psychiatrist; and that she was not taking any psychotropic medications or any kind of prescription medications. (Tr. 153-154).

Dr. Rabun reported that Plaintiff said she had burning in her feet and up the left side of her leg for the past five to ten years; that the burning sensation was worse in her left foot than in her right foot; that she had been evaluated for her complaints of pain; that she had a "normal" nerve conduction test; that she had an "unremarkable" MRI of the lumbar spine; that she did not have diabetes; and that she had been diagnosed with a neuropathy of both lower extremities, with the left being greater than the right. (Tr. 153).

Upon examination Dr. Rabun reported that Plaintiff was sixty-two inches tall and 220 pounds; that her blood pressure was 192/92; that her cranial nerves were intact; that her pupils were equal, round and reactive to light; that her discs were sharp bilaterally; that there was normal tone and bulk during a motor exam; that no muscle atrophy was noted; that Plaintiff complained of pain and tenderness in the lumbar region; that she had a normal range of motion in both elbows, knees, and ankles; that she had reduced range of motion on flexion-extension in the lumbar region to twenty degrees; that she had a normal left and right lateral flexion; that her strength was 5/5 and equal throughout; that her deep tendon reflexes were 2+ and symmetric; that her toes were flexor bilaterally; that she had no pronator drift in either upper extremity; that her fine finger movements were normal in both of her hands; that a neurological sensory exam showed normal sensation to temperature and to a light touch across Plaintiff's face and upper extremities; that Plaintiff complained of a burning sensation in both feet and in the left lower extremity to the knee; and that Plaintiff otherwise had normal sensation to temperature and light touch in both lower extremities. Dr. Rabun reported that Plaintiff's coordination neurological exam showed that she had normal finger to nose testing; that she was able to walk slowly in tandem without losing her balance; that she could not walk on her toes; that she walked slowly due to the pain in her feet; that she could take several steps on her heels; and that she did not use an ambulatory device. (Tr. 154). Dr. Rabun concluded that

Plaintiff had a neuropathy of unknown origin in both lower extremities and pain and decreased range of motion in the lumbar region. (Tr. 155)

Dr. Rabun also reported that Plaintiff appeared her age; that she was pleasant and cooperative; that she did not exhibit abnormal psychomotor activity; that she maintained good eye contact; that she could recite the months of the year in reverse order; that her flow of thought was logical, sequential, and goal-directed; that her speech was soft and adequately modulated in rate; that her affect was appropriate; that Plaintiff described her own mood as "depressive"; that her content of thought revealed some symptoms associated with depression including a low mood, trouble maintaining sleep, and crying spells; that Plaintiff related no other features nor endorsed any signs of major depression; that she reported no negative thoughts about herself; that she did not report any suicidal or homicidal ideas, features of anxiety, hallucinations, or delusions; that she was alert and oriented to time, place, person and reason during the interview; that she named the current and the past presidents; that she remembered three words immediately and also remembered them after five minutes of distraction; that she could provide recent and remote information of a personal nature; that her intellectual capacity was average range; and that her insight and judgment were both preserved. (Tr. 155).

Dr. Rabun's assessment was, at Axis I, depressive disorder not otherwise specified; at Axis II, no diagnosis; at Axis III, lumbar region pain, bilateral lower extremity pain related to neuropathy, and high blood pressure; at Axis IV, unemployed with no source of income, and chronic pain; and at Axis V, a current GAF of 70.[2] (Tr. 155).

---

[2] Global assessment of functioning ("GAF") is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. See Diagnostic and Statistical Manual of Mental Disorders, DSM-IV, 30-32 (4th ed. 1994). Expressed in terms of degree of severity of symptoms or functional impairment, GAF scores of 31 to 40 represent "some impairment in reality testing or

Dr. Rabun's report of January 10, 2005 further states that Plaintiff did not show evidence of a psychiatric disorder that would interfere with her ability to focus, concentrate or remember instructions; that she can interact appropriately in a social setting and could adapt to changes in her environment; that she suffers from a neuropathy of both lower extremities, the left being greater than the right; that "this limits her ambulation abilities in that she has to walk slowly due to pain elicited while walking"; that her ambulation abilities are limited; and that Plaintiff is capable of managing her own funds and benefits. (Tr. 155).

Dr. Rabun completed a "Range of Motion Values" form on January 10, 2005, in which he reported that Plaintiff could fully extend her hand and could make a fist; that her left and right grip strengths were normal; that her left and right upper extremity strengths and her upper extremity strength effort was good; that her lumbar spine flexion-extension was twenty degrees; that her left and right lumbar lateral flexion were twenty five degrees; that her left and right lower extremity muscle weakness was normal; and that her lower extremity muscle weakness effort was good. (Tr. 157-158).

On February 1, 2005, in an "Explanation of Determination" Report, Lisa Cole, Senior Counselor, reviewed Plaintiff's medical records. Ms. Cole reported that there were "no clinical findings which corroborate [Plaintiff's] subjective complaints"; that Plaintiff's statements were not credible; that she had a minimal work history; that she had "no medical f/u"; that she worked part-time with out "apparent difficulties"; that "she takes no medications despite her complaint of extreme

_____

communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," 41 to 50 represents "serious," scores of 51 to 60 represent "moderate," scores of 61 to 70 represent "mild," and scores of 90 or higher represent absent or minimal symptoms of impairment. Id. at 32.

pain; and that there was "no MDI which would impede [Plaintiff's] ability to engage in work related activities." (Tr. 117).

James M. Spence, Ph.D., completed a "Psychiatric Review Technique" Form for Plaintiff on February 2, 2005. Dr. Spence reported that Plaintiff's impairment was not severe; that the disposition was based on affective disorder; and that Plaintiff had "Depressive D/O, NOS dx'd per CE 1/05." Dr. Spence further reported that Plaintiff had no restriction of activities of daily living; that Plaintiff had no difficulties in maintaining social functioning, concentration, persistence or pace; and that she had no episodes of decompensation each of extended duration. Dr. Spence's notes state that Plaintiff "alleged depression in addition to other physical complaints for which no MDI was determined"; that Plaintiff had no history of psychiatric treatment or hospitalizations; that she was not on any medication; that she had "no PCP and ha[d] not seen a physician in a couple of years"; that "Dr. Rabun's impression was depressive disorder, nos with a current GAF of 70"; and that she did not endorse symptoms or limitations consistent with a severe impairment. (Tr. 104-115).      Records of Tammy M. Hansen of Hillsboro Chiropractic reflect that this doctor saw Plaintiff on April 13, 2005. Dr. Hansen's notes of this date state that Plaintiff reported that  pain radiated into her left hip, right leg, and right foot; that the pain occurred between seventy-five percent to 100 percent of the time she was awake; that the pain precluded carrying out her "ADL's"; and that standing, sitting and walking aggravated her pain. (Tr. 139-140).

Dr. Hansen reported, upon examination, that Plaintiff was mentally alert and cooperative; that her superficial appearance suggested distress; that Minor's Sign, usually an indication of sciatica, was present. Dr. Hansen's objective evaluation was that Plaintiff's lumbar spine flexion was 20 degrees with pain and spasm, with normal being 60+; that her lumbar spine extension was 15 degrees with pain and spasm, with normal being 25+; that her lumbar spine left lateral flexion was 20 degrees with

pain and spasm, with normal being 25; and that her lumbar spine right lateral flexion was 20 degrees with pain and spasm, with normal being 25. Dr. Hansen reported that a Standing Test revealed presence of Dejerine's Sign on the left side; that Kempt's Test was positive on the left side; that Valsalva Maneuver was positive; that Milgram's Test was positive; and that Plaintiff was unable to perform deep knee bends, heel walking, or toe walking. Dr. Hansen further reported that a palpitation evaluation showed "myofascial trigger point complexes with hypermyotonia and a vocalized, sharp pain response of the left iliotibial band, left pinformis, gluteus medius and quadratus lumborum." (Tr. 140).

Dr. Hansen's assessment was that Plaintiff had lumbar disc displacement, pain in the limb, and muscle spasms and that Plaintiff would respond as expected to treatment and would experience favorable results. Dr. Hansen rated Plaintiff's prognosis as "fair" and stated that Plaintiff was a complicated case; that although there was a probability of permanent residuals, continued improvement was expected; that Plaintiff was in a relief phase of care; that her recommendation was electrical muscle stimulation and spiral manipulation daily; and that the goals of the treatment plan included decreasing Plaintiff's pain, swelling, inflammation, and spasms and increasing her ability to perform normal activities of daily living. (Tr. 141).

Dr. Hansen's treatment notes from April 18, 2005 state that Plaintiff reported that her lower back pain was a nine on a scale of one to ten; that the effect of this pain was felt between seventy-six to 100 percent of the time she was awake; and that this pain prevented certain activities of daily living. Dr. Hansen's reported that Plaintiff's active and passive ranges of motion of the thoracic and lumbar regions of the spine were very restricted, with pain and spasm. Dr. Hansen's notes further stated that a palpatory inspection of Plaintiff's thoracic and lumbar regions of the spine revealed hypertonicity, slight pain and active myofascial trigger points; that palpation revealed myofascial trigger point

complexes with hypermyotnia; and that palpation revealed a vocalized, sharp pain response of the left

iliotibial band, left ponformis, gluteus medius and quadratus lumborum

Dr. Hansen also stated in her April 18, 2005 report, that she performed and/or recommended

electrical muscle stimulation and spinal manipulation in order to decrease Plaintiff's pain, swelling,

inflammation, spasms, and in order to increase Plaintiff's ability to perform normal activities of daily

living. (Tr. 141).

# IV.
# DECISION OF THE ALJ

The ALJ noted that Plaintiff was fifty years old; that she had a GED; that she had training as

a medical technician, as a certified nurse's aide and in cosmetology; that she worked in a variety of

hospital aide positions; that she worked as a receptionist and hairstylist; that she only worked these

jobs sporadically and on a part time basis; that her earnings from these jobs did not qualify as

substantial gainful activity as set out by the Regulations; that Plaintiff's only past relevant work

appeared to be in 1998 as a nurse's aide which, according to the Dictionary of Occupational Titles,

was performed at a medium level. (Tr. 12-13).

The ALJ stated that a claimant who engages in "'substantial gainful activity'" will be found

"'not disabled'" regardless of health, age, education or previous work experience.  The ALJ stated

that Plaintiff alleged disability beginning October 1, 1996; that evidence showed Plaintiff earned

$7,428.98 in 1998 and that according to the Regulations these earnings were indicative of substantial

gainful activity. The ALJ further concluded that Plaintiff had not engaged in substantial gainful

activity from October 1, 1996, through December 31, 1997, and from January 1, 1999, through the

present. (Tr. 13).

The ALJ then stated that Plaintiff had the burden of proof to show that she had a medically

determinable "'severe'"impairment(s) which significantly limited her physical or mental ability to do

basic work activity. The ALJ found that Plaintiff had several "'severe'" impairments including: (1) a history of low back, leg, and foot pain of an unknown origin which was treated sporadically with prescriptive pain medication, and (2) morbid obesity, as Plaintiff was five feet two inches tall and 214 pounds. The ALJ did not consider Plaintiff's depressive disorder as severe. (Tr. 13).     Next, the ALJ stated that Plaintiff had to demonstrate that she had an impairment or combination of impairments that met or equaled an impairment listed in Appendix 1, Subpart P, Regulation No. 4. The ALJ noted that he considered Medical Listings 1.02 through 1.08 with respect to Plaintiff's musculoskeletal impairments. The ALJ held that Plaintiff's orthopedic complaints did not qualify as an impairment or combination of impairments which met or equaled the criteria of the listings in Appendix 1. (Tr. 13-14).

The ALJ further stated that Plaintiff had the burden to establish how her residual functional capacity ("RFC") was reduced by her impairments and that her testimony and the "'credibility'" of her testimony would be considered in assessing her RFC. The ALJ considered Plaintiff's testimony and noted that Plaintiff alleged that her major medical problem was with respect to the constant and severe low back, left leg and foot pain; that she had diagnostic testing but her physicians were still unable to come up with a diagnosis for her orthopedic condition; that for a long time Plaintiff could not afford treatment until her husband obtained health insurance; and that she was scheduled to see a physician in the near future. The ALJ also considered Plaintiff's prescription and over-the-counter medications, both past and present and her mental health condition. (Tr. 14).

The ALJ stated he evaluated Plaintiff's credibility according to the Regulations and the Polaski criteria. As such, he considered Plaintiff's work record, motivation to work, and daily activities. The ALJ noted that inconsistencies in the record may be considered in a credibility

determination and noted that an ALJ "may properly discount subjective complaints where there are inconsistencies in the record as a whole." (Tr. 15-16).

The ALJ considered the medical evidence and noted that signs, symptoms and laboratory findings must prove the disability. The ALJ stated that the medical evidence must be carefully considered to determine if an "'underlying medical condition or conditions'" can verify one's credibility about complaints and her restrictions from working. (Tr. 16).

The ALJ found that Plaintiff did not have a disabling physical impairment, individually or in combination, that would preclude her from performing all types of competitive employment. The ALJ supported his conclusion by discussing Plaintiff's medical testing and physical examinations and by stating that the physical examinations and diagnostic findings had been relatively benign. The ALJ further held that Plaintiff's testimony was not credible "with respect to the severity of her overall medical condition and inability to perform any type of gainful employment" and that her claim of disability was not supported by the totality of the evidence. He found that Plaintiff, "secondary to her overall medical condition, including her obesity, has a residual functional capacity for a wide range of light work" including jobs which could require lifting up to twenty pounds, a frequent lifting of up to ten pounds, and standing or walking for six hours of an eight hour workday. The ALJ held that Plaintiff was unable to perform her past relevant work as a nurse's aide, which was at a medium level. (Tr. 18).

Next, the ALJ shifted the burden to the Commissioner to show that there were jobs existing in significant numbers in the national economy which Plaintiff could perform despite her medically determinable impairments, functional limitations, age, education, and prior work experience. The ALJ considered and discussed Plaintiff's age, education, and past work experience and noted that Plaintiff's past work experience had been medium in exertion, equipping her with no skills which

would readily transfer to work within her RFC; that Plaintiff had a RFC for a wide range of light work; and that, according to Rule 202.14 of Appendix 2 and 20 C.F.R. § 416.969, Plaintiff was not disabled. (Tr. 18). The ALJ held that because Plaintiff was capable of performing light level work activity and because there were a significant number of jobs in the economy which she could perform, the Commissioner's burden was met. The ALJ added that in making his decision, he did consider the findings, opinions, and assessments of the non-examining State agency programs counselor. (Tr. 19). The ALJ's concluded that Plaintiff was not eligible for disability benefits. (Tr. 20).

## V.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. § § 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" <u>Goff v. Barnhart</u>, 421 F.3d 785, 790 (8th Cir. 2005) (quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. § § 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. § § 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities …" <u>Id.</u> Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. <u>Id.</u> Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. § § 416.920(e), 404.1520(e). The burden rests with the

claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Young v. Afpel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. § § 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004) ("The burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner at step five."); Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004) ("[T]he burden of production shifts to the Commissioner at step five to submit evidence of other work in the national economy that [the claimant] could perform, given her RFC").

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

It is not the job of the district court to re-weigh the evidence or review the factual record de novo. McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). Thus, an administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

(1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Education and Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months …." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health and Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record,

observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing.  Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 841(8th Cir. 1992); Ricketts v. Sec'y of Health and Human Servs., 902 F.2d 661, 664 (8th Cir. 1990); Jeffery v. Sec'y of Health and Human Servs., 849 F.2d 1129, 1132 (8th Cir. 1988).  It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health and Human Servs., 850 F.2d 425, 429 (8th Cir. 1988).  The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004).  The ALJ need only acknowledge and consider those factors. Id.   Although credibility determinations are primarily for the ALJ and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

Residual functional capacity is defined as what the claimant can do despite his or her limitations, 20 C.F.R. § 404.1545(a), and includes an assessment of physical abilities and mental impairments.  20 C.F.R. § 404.1545(b-e). The Commissioner must show that a claimant who cannot perform his or her past relevant work can perform other work which exists in the national economy. Nevland, 204 F.3d at 857 (citing McCoy v. Schweiker, 683 F.2d 1138, 1146-7 (8th Cir. 1982) (en banc).  The Commissioner must first prove that the claimant retains the residual functional capacity to perform other kinds of work. Id. The Commissioner has to prove this by substantial evidence. Warner v. Heckler, 722 F.2d 428, 431(8th Cir. 1983).  Second, once the plaintiff's capabilities are

established, the Commissioner has the burden of demonstrating that there are jobs available in the national economy that can realistically be performed by someone with the plaintiff's qualifications and capabilities. Nevland, 204 F.3d at 857.

To satisfy the Commissioner's burden, the testimony of a vocational expert may be used. An ALJ posing a hypothetical to a vocational expert is not required to include all of a plaintiff's limitations, but only those which he finds credible. Rautio, 862 F.2d at 180; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Use of the Medical-Vocational Guidelines is appropriate if the ALJ discredits the plaintiff's subjective complaints of pain for legally sufficient reasons. Carlock v. Sullivan, 902 F.2d 1341, 1343 (8th Cir. 1990); Hutsell, 892 F.2d at 750.

# VI.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Thus, even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm her decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

Plaintiff contends that the ALJ did not properly consider Plaintiff's medically determinable impairments; that he failed to properly evaluate the medical opinion evidence including records of Dr. Hansen, Dr. Head, Dr. Rabun, and Dr. Winterberger; that he failed to properly consider Plaintiff's RFC under the standards set forth in Singh v. Apfel, 222 F.3d 448 (8th cir. 2000), and Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2002); that he failed to articulate a legally sufficient reason for failing to properly consider Social Security rulings relevant to obesity; that the ALJ failed to properly consider Plaintiff's subjective complaints pursuant to Polaski; that the ALJ failed to properly consider

Plaintiff's nonexertional limitations; and that the ALJ failed to consider the opinion of a vocational expert.

## A.    Medical Evidence:

Plaintiff alleged that she was disabled due to constant and severe low back left leg and foot pain. Plaintiff contends that the ALJ did not properly consider the medical evidence relevant to her allegations of pain including doctor's records and reports. The ALJ concluded that Plaintiff does not have a disabling physical impairment, either singularly or in combination, which would prevent her from performing all types of competitive employment. Additionally, the ALJ concluded that Plaintiff's depressive disorder was not severe. The ALJ considered Plaintiff's medical records relating to her complaints, including reports of treating and consulting doctors. In particular, the ALJ considered and discussed treatment records from Plaintiff's chiropractor, Dr. Hansen. The ALJ noted that Dr. Hansen rated Plaintiff's prognosis as "fair" and although her case was complicated, she expected Plaintiff would undergo *continued improvement* despite probable permanent residuals. The ALJ did not find that Dr. Hansen's conclusions contributed to a finding of total disability, and held that her "findings and comments with respect to the severity of claimant's orthopedic condition [were] not supported by the totality of the medical evidence as previously discussed," by Plaintiff's infrequent medical treatment, or by Plaintiff's demonstrated level of functioning. Further, the ALJ noted that chiropractors were not considered acceptable medical sources according to Social Security Regulations, 20 C.F.R. § 416.913(d)(1). (Tr. 18).

Indeed, chiropractors are not "acceptable medical source(s)" for purposes of 20 C.F.R. § 404.1513. Their opinions, however, may be considered as "other" medical sources. Id. at (d)(1). "In addition to evidence from the acceptable medical sources ... [an ALJ] may also use evidence from other sources to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's]

ability to work." Id. Thus, Dr. Hansen's opinion was not controlling. Moreover, "[i]t is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). The opinions and findings of the plaintiff's treating physician are entitled to considerable weight. Indeed, if they are not controverted by substantial medical or other evidence, they are binding. Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)). However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data. Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8thCir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data). See also Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is giving controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence"). Where diagnoses of treating doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000). "Medical reports of a treating physician are ordinarily entitled to greater weight than the opinion of a consulting physician." Chamberlin, 47 F.3d at 1494 (citing Matthews, 879 F.2d at 424).

When considering the weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole.").

In Plaintiff's case, in addition to Dr. Hansen, Plaintiff was treated by Dr. Head who conducted tests to determine the source of Plaintiff's complaints. The ALJ considered Dr. Head's records including his impression upon examination and the results of tests he conducted. In particular, the ALJ considered that Dr. Head reported that x-rays showed only slight irregularity in the condylar surface; that the vertebral bodies were normally aligned without any fracture, dislocation or bony destruction; that disc spaces were well maintained; that sacroiliac joints were patent bilaterally; and that there was no evidence of fracture, dislocation or bony destruction of the pelvis. Additionally, the ALJ considered that blood work showed no evidence of any type of neuropathy. The court further notes that Dr. Head reported that Plaintiff's nerve conduction studies of both lower extremities were well within normal limits; that an EMG was normal; and that Plaintiff was responding well and tolerating medication to help her sleep. He also reported that Plaintiff had reflexes which tended to negate a finding of neuropathy etiology. The ALJ considered the nerve conduction studies to which Dr. Head referred as well as laboratory tests of April 2002.

Plaintiff was also treated by Dr. Winterberger, who reported that Plaintiff had no motor or cerebellar deficits; that her extremities had no erythema, edema, cyanosis or clubbing; and that her feet were cool to the touch. Radiology records of November 2004 state that vertebral bodies were normally aligned, disc spaces were well maintained, sacroiliac joints were patent, and no fractures were observed. Dr. Rabun, who evaluated Plaintiff, reported that Plaintiff's cranial nerves were

intact; that her discs were sharp bilaterally; that a motor exam showed normal tone and bulk, normal range of lateral flexion and reduced range of flexion extension in the lumbar region, normal fine finger movements, and toes which were flexor; and that Plaintiff had a normal sensory examination. To the extent that the ALJ did not specifically mention the reports of all doctors who treated and/or examined Plaintiff, and to the extent that although the ALJ referenced doctors' reports but did not refer to a doctor by name, an ALJ's failure to cite specific evidence does not indicate that such evidence was not considered. See Montgomery v. Chater, 69 F.3d 273,275 (8th Cir. 1995). See also Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000) (citing Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (holding that an ALJ is not required to discuss every piece of evidence submitted and that an "ALJ's failure to cite specific evidence does not indicate that such evidence was not considered").

In regard to Plaintiff's depressive disorder, the ALJ considered Dr. Rabun's report that Plaintiff was able to interact appropriately and adapt to changes in her environment; that Dr. Rabun reported that Plaintiff showed no evidence of a psychiatric disorder; and that Dr. Rabun assessed Plaintiff's GAF at 70. As stated below, a GAF of 70 indicates a mild functional impairment. See n.2, infra. Based on Dr. Rabun's report, the ALJ found that Plaintiff's depressive disorder is not severe. The court finds that the ALJ's findings in regard to Plaintiff's depressive disorder is based on substantial evidence.

The court further finds, in regard to Plaintiff's physical complaints, that the ALJ properly discredited the opinion of Dr. Hansen; that in so doing he referred to test results and the opinions and records of treating and examining doctors; that the ALJ properly considered the opinions of treating and examining doctors; and that the ALJ's decision is supported by substantial evidence in regard to the medical evidence. See Reed, 399 F.3d at 920; Prosch, 201 F.3d at 1013; Chamberlain, 47 F.3d

at 1494. The court further finds that the ALJ's resolution of conflicts in the records and among the opinions of the various doctors is based on substantial evidence. See Estes, 275 F.3d at 725. Moreover, the ALJ considered the entire record upon reaching his conclusion. See Wilson, 172 F.3d at 542.

**B.    Plaintiff's Obesity:**

Plaintiff contends that although the ALJ found she is morbidly obese, the ALJ did not consider this condition when he determined her RFC. Indeed, the ALJ found that Plaintiff was morbidly obese as she is five feet two inches tall and weighs 214 pounds. The ALJ further found that Plaintiff's obesity is severe although he found that Plaintiff did not introduce evidence to establish that any of her alleged disabling conditions meets or equals a listing. Additionally, the ALJ found that "secondary to [Plaintiff's] overall medical condition, including her obesity, [she] has a residual functional capacity for a wide range of light work. Light work requires a maximum lifting of 20 pounds; a frequent lifting of 10 pounds; standing/waling for 6 our of 8 hours." (Tr. 18). As such, the ALJ did consider the effects of her obesity on her RFC.

The court notes that the record does not reflect that Plaintiff sought or received treatment for obesity or that any doctor imposed restrictions on her because of her obesity. See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004); Stormo v. Barnhart, 377 F.3d 801, 807 (8th Cir. 2004). Failure to seek medical treatment as a basis to discredit claims of a disabling condition is a consideration when discrediting a claimants complaints of pain. See Rautio, 862 F.2d at 179. Additionally, 20 C.F.R., Pt. 404, Subpt. P, App. 1, 1.00, Q, states:

> Effects of obesity. Obesity is a medically determinable impairment that is often associated with disturbance of the musculoskeletal system, and disturbance of this system can be a major cause of disability in individuals with obesity. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. Therefore, when determining whether an individual with obesity has a listing-level impairment or combination of

impairments, and when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity, adjudicators must consider any additional and cumulative effects of obesity.

Social Security Ruling ("SSR") 02-01p, 2000 WL 628049, at *2-5 (Sept. 12, 2002), states,

in relevant part, that:

Obesity is a complex, chronic disease characterized by excessive accumulation of body fat. Obesity is generally a combination of factors (e.g., genetic, environmental, and behavioral). . . .

We will consider obesity in determining whether:

The individual has a medically determinable impairment. . . .

The individual's impairment(s) is severe. . . .

The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings. . . .

The individual's impairment(s) prevents him or her from doing past relevant work. . . .

If an individual has the medically determinable impairment obesity that is "severe" as described [above], we may find that the obesity medically equals a listing. . . . We may find in a title II claim, or an adult claim under title XVI, that the obesity results in a finding that the individual is disabled based on his or residual functional capacity (RFC), age, education, and past work experience. However, we will also consider the possibility of coexisting or related conditions, especially as the level of obesity increases. . . .

*There is no specific weight or BAI that equates with a "severe" or a "not severe" impairment. . . . Rather, we will do an individualized assessment of the impact of obesity on an individual's functioning when deciding whether the impairment is severe. . . .*

Because there is no listing for obesity, we will find that an individual with obesity may meet the requirements of a listing if he or she has another impairment that, by itself, "meets" the requirements of a listing. We will also find that a listing is met if there is an impairment that, in combination with obesity, meets the requirements of a listing. For example, obesity may increase the severity of coexisting or related impairments to the extent that the combination of impairments meets the requirements of a listing.

(emphasis added).

As stated above, SSR 02-1p provides that an assessment of the impact of a claimant's obesity is made on an individualized basis. Thus, Plaintiff is not per se disabled merely because she is obese nor is her ability to perform light work necessarily restricted because she is obese. In Plaintiff's case the ALJ considered Plaintiff's medical records and reports of her limitations as found by physicians and concluded that notwithstanding her obesity she retained the RFC for light work. Moreover, the ALJ made it clear that he was considering Plaintiff's conditions both individually as a whole. As such, the court finds that the ALJ's consideration of Plaintiff's obesity is consistent with the case law and Regulations and that it is supported by substantial evidence. To the extent that the ALJ's did not elaborate on his conclusions regarding Plaintiff's obesity, such a failure "does not require reversal because the record supports [the ALJ's] overall conclusion." Karlix v. Barnhart, 457 F.3d 742, 746 (8th Cir. 2006) (citing Pepper ex rel. Gardner v. Barnhart, 342 F.3d 853, 855 (8th Cir. 2003)).

## C.      Plaintiff's RFC:

Plaintiff contends that the ALJ did not properly consider the medical evidence to determine her RFC and that he did not properly include her obesity in her RFC. As set forth above, the ALJ considered the medical evidence and the requirements of light work and further concluded that Plaintiff has the RFC for a wide range of light work despite her obesity. The Regulations define light work as 'involv[ing] lifting no more than 20 pounds at a time with frequent lifting or carrying of objects up to 10 pounds." 20 C.F.R. § 416.967(a). Additionally, "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251,*6 (SSA).

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer, 245 F.3d at 703. "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. A "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh, 222 F.3d at 451). The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam ), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Eichelberger, 390 F.3d at 591.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." Id. Moreover, "[i]t is incorrect to find that an individual has

limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." Id.

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." Id. at *3. As stated above, at step 4 the claimant has the burden of persuasion to demonstrate his or her RFC. Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner." Goff, 421 F.3d at 790 (citing Eichelberger, 390 F.3d at 591). In contrast to the first four steps of the sequential evaluation where the claimant carries the burden of proof, the Commissioner has the burden of production at step 5. Charles v. Barnhart, 375 F.3d 777, 782 n.5 (8th Cir. 2004). At step 5 "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." Goff, 421 F.3d at 790. Also, at step 5, where a claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id.

The Eighth Circuit has recently held in Eichelberger, 390 F.3d at 591, as follows:

> A disability claimant has the burden to establish her RFC. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. Id. We have held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). "[S]ome medical evidence" must support the determination of the claimant's RFC, Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Upon making an RFC assessment an ALJ must first identify a claimant's functional limitations or restrictions and then assess his or her work-related abilities on a function-by-function basis. See Masterson, 363 F.3d at 737. Pursuant to this requirement, the ALJ in the matter under consideration found that Plaintiff's subjective complaints were not credible and further found that her functional limitations included lifting no more than ten pounds frequently and twenty pounds occasionally. After considering the medical evidence, the credibility of Plaintiff's subjective complaints, and the requirements of light work, the ALJ concluded that Plaintiff could engage in light work.

The court finds that the ALJ's findings in regard to Plaintiff's RFC is based on substantial evidence on the record. First, the record does not establish that any doctor treated Plaintiff for obesity. While Dr. Head and Dr. Winterberger noted that Plaintiff was overweight, the record does not reflect that any doctor imposed restrictions upon Plaintiff based on her obesity or noted that Plaintiff's obesity was a problem. Second, Dr. Head reported that nerve conduction studies regarding Plaintiff's lower extremities were within normal limits and that Plaintiff's motor testing showed 5/5 strength, normal coordination and gait. Third, Plaintiff testified that she can lift a bag of groceries weighing ten to twelve pounds; that she can lift and carry about twenty pounds across a room; and that as a nurse's aide she lifted up to 100 pounds with the help of others and twenty to thirty pounds by herself. Fourth, the medical evidence does not suggest that Plaintiff is unable to lift ten pounds frequently and twenty pounds occasionally. Fifth, as discussed below, after the date upon which she alleges she became disabled Plaintiff worked in several jobs; she worked as a substitute nurse; and she worked as a nurse's aide in 1998 during which year she had earnings of $7,428.98.

As stated above, a claimant has the burden to establish disability. Plaintiff in the matter under consideration did not provide evidence that she is disabled. While Plaintiff claims that she has

disabling pain in her back, left leg, and foot, the ALJ discredited Plaintiff's complaints in regard to this pain. The court finds below that the ALJ's discrediting Plaintiff's complaints of pain is supported by substantial evidence and is consistent with the Regulations and case law. Moreover, obesity does not per se preclude or limit a claimant's ability to engage in substantial gainful activity; only if obesity interferes with a claimant's ability to work and only if obesity is a work-related restriction need it be included in a claimant's RFC. See Forte v. Barnhart, 377 F.3d 892, 896-97 (8th Cir. 2004). As such, the court finds that the ALJ's determination of Plaintiff's RFC is consistent with his findings regarding the medical evidence and Plaintiff's credibility and that it is based on substantial evidence on the record. See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all of the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations") (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir.1995).

**D.      Vocational Expert Testimony:**

Plaintiff contends that the ALJ did not properly consider her nonexertional limitations and that the ALJ should have solicited the testimony of Vocational Expert. In the matter under consideration the ALJ relied upon the Medical-Vocational Guidelines to determine that there was work in the economy which a person with Plaintiff's RFC could preform.

Resort to the Medical-Vocational Guidelines is only appropriate when there are no nonexertional impairments that substantially limit the ability of Plaintiff to perform substantially gainful activity. Indeed, once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). See also Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996) (holding that when complaints of pain are explicitly discredited by

legally sufficient reasons, Guidelines may be used). If the claimant is found to have only exertional impairments, the Commissioner may meet this burden by referring to the Medical Vocational Guidelines. See Robinson, 956 F.2d at 839. If, however, the claimant is also found to have nonexertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a vocational expert to establish that there are jobs in the national economy that the claimant can perform. See id.

SSR 83-10, 1983 WL 31251, at *6,defines a non-exertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for activities." SSR 83-10, 1983 WL 31251, at *7, defines nonexertional limitation as "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities." 20 C.F.R. § 416.969(a) provides: "Limitations or restrictions which affect your ability to meet the demands of jobs other than the strength demands, that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling, are considered nonexertional." Thus, examples of nonexertional limitations include "difficulty tolerating some physical feature[s] of certain work settings" and "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling or crouching." Id. at (c)(1)(v)-(vi).

The Eighth Circuit holds that to require the testimony of a vocational expert based on a claimant's obesity, the claimant "must relate his [] obesity [] to any nonexertional limitations." Burrow v. Massanari, 8 Fed. Appx. 582, 584 (8th Cir. 2001) (unreported) (citing 20 C.R.F. §416.969a(c)). The Eighth Circuit, moreover, has explained the circumstances when a claimant has

nonexertional limitations but the ALJ need not resort to the testimony of a VE. The court held in

Sanders v. Sullivan, 983 F.2d 822, 823 (8th Cir. 1992), that:

> "[A]n ALJ may use the Guidelines even though there is a nonexertional impairment if the ALJ finds, and the record supports the finding, that the nonexertional impairment does not diminish the claimant's residual functional capacity to perform the full range of activities listed in the Guidelines." Thompson v. Bowen, 850 F.2d 346, 349-50 (8th Cir.1988). However, if the claimant's nonexertional impairments diminish his or her residual functional capacity to perform the full range of activities listed in the Guidelines, the Secretary must produce expert vocational testimony or other similar evidence to establish that there are jobs available in the national economy for a person with the claimant's characteristics. Id. at 349. "Nonexertional limitations are limitations other than on strength but which nonetheless reduce an individual's ability to work." Asher v. Bowen, 837 F.2d 825, 827 n. 2 (8th Cir.1988). Examples include "mental, sensory, or skin impairments, as well as impairments which result in postural and manipulative limitations or environmental restrictions." Id.; See 20 C.F.R., Pt. 404, Subpt. P, App. 2, § 200.00(e) (1992).

See also Harris v. Shalala, 45 F.3d 1190, 1194 (8th Cir.1995); Reed v. Sullivan, 988 F.2d 812, 816

(8th Cir. 1993) ("[T]he ALJ may rely on the guidelines to direct a conclusion of either disabled or not

disabled without resorting to vocational expert testimony if the ALJ determines that a claimant's

nonexertional limitations do not *significantly* affect the claimant's RFC.") (emphasis added) (citing

Thompson v. Bowen, 850 F.2d 346, 349 (8th Cir. 1988)).

As set forth above and below, the ALJ's discrediting Plaintiff's subjective complaints based

on the medical evidence and Polaski factors is supported by substantial evidence. See Reynolds v.

Chater, 82 F.3d 254, 258-59 (8th Cir. 1996) (holding that when a claimant's complaints of pain are

discredited by the ALJ for legally sufficient reasons, the Guidelines may be used). The ALJ found

that Plaintiff's obesity is a severe impairment but he further found that this impairment does not limit

or diminish her capacity to perform light work. The court has found above that the ALJ gave proper

consideration to Plaintiff's obesity upon determining her RFC and that the decision in this regard is

supported by substantial evidence. Moreover, after considering Dr. Rabun's report and the record

as a whole the ALJ found Plaintiff's depressive disorder was not severe. The court has found above

that this finding is based on substantial evidence. The ALJ did not find that Plaintiff has a nonexertional impairment which limits her ability to perform substantial gainful activity. See Robinson, 956 F.2d at 839. Under such circumstances the ALJ was not required to utilize the assistance of a vocational expert. See Reed, 988 F.2d at 816; Sanders, 983 F.2d at 823. Plaintiff's arguments that the ALJ failed to properly consider her nonexertional limitations and that the ALJ should have utilized the testimony of a vocational expert, therefore, are without merit.

E.    **Polaski Factors:**

As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ. Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, as also more fully set forth above, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Wheeler, 224 F.3d at 896 n.3; Reynolds, 82 F.3d at 258; Montgomery, 69 F.3d at 275. Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Brown v. Chater, 87 F. 3d 963, 966 (8th Cir. 1996). In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). For the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, in regard to Plaintiff's allegations of disabling orthopedic pain, the ALJ noted that Plaintiff had "very sporadic medical treatment"; that there were no records of ongoing physical therapy, pain management, or epidural injections; and that there were no records of frequent emergency room visits or inpatient hospitalizations for her orthopedic pain. The ALJ also noted that Plaintiff had long gaps in treatment between July 2002 and February 2003 and between February 2003 and October 2004. (Tr. 17). The ALJ also noted that Plaintiff did not have any psychotherapy and that she had not been psychiatrically hospitalized. The ALJ further considered that lack of medical treatment could outweigh subjective complaints and that even infrequent treatment could be a basis for discounting subjective complaints. (Tr. 15). Seeking limited medical treatment is inconsistent with claims of disabling pain. Nelson v. Sullivan, 946 F.2d 1314, 1317 (8th Cir. 1991); James for James v. Bowen, 870 F.2d 448, 450 (8th Cir. 1989). The court finds that the ALJ properly considered that Plaintiff received limited medical treatment and that the ALJ's decision in this regard is supported by substantial evidence and is consistent with the Regulations and case law.

Second, the ALJ considered that Plaintiff alleged she could not afford medical treatment or medications and noted that according to case law, lack of financial resources is not automatically an excuse for lack of medical treatment. He further considered that according to SSR 82-59, one must exhaust all free or subsidized sources of treatment and document her financial circumstances before lack of financial resources could be a satisfactory reason to fail to seek medical treatment. The ALJ considered that there was no evidence Plaintiff sought "any low-cost medical treatment from her doctor or from clinics and hospitals" nor was there any evidence that Plaintiff had ever been denied medical treatment because she could not afford it. (Tr. 16). In some circumstances, failure to seek medical treatment based on inadequate financial resources may explain a plaintiff's failure. See Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989). Even assuming that Plaintiff's financial

resources were insufficient, failure to seek treatment offered to indigents detracts from a claim that a claimant did not seek medical treatment because of inadequate financial resources. See Riggins, 177 F.3d at 693. The court finds that the ALJ's decision in this regard is supported by substantial evidence and that it is consistent with the Regulations and case law.

Third, the ALJ considered that Plaintiff had not consistently taken any prescription medication for the constant pain she reported in her back, legs, and feet and that at certain times, she was taking no prescription medications. Plaintiff stated in claimant questionnaires that she did not take prescription medication for her pain and that she was taking over-the-counter medication only. (Tr. 91, 97). While Plaintiff testified at the hearing that she was taking Darvocet, she also testified that her dentist had prescribed this medication in May 2005 and that no medical doctor had prescribed it. She also testified that prior to her dentist prescribing Darvocet she had not taken prescription medication since about August 2004. (Tr. 45-46). The ALJ stated that case law holds that "a lack of strong pain medication is inconsistent with subjective complaints of disabling pain" and that "pain which can be remedied or controlled with over-the-counter analgesics normally will not support a finding of disability." Where a plaintiff has not been prescribed any potent pain medication, an ALJ may properly discount the plaintiff's complaints of disabling pain. Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994); Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (holding that, despite a plaintiff's argument that he was unable to afford prescription pain medication, an ALJ may discredit complaints of disabling pain where there is no evidence that the claimant sought treatment available to indigents); Haynes v. Shalala, 26 F.3d 812, 814 (8th Cir. 1994); Benskin, 830 F.2d at 884 (holding that treatment by hot showers and taking dosages of Advil and aspirin do not indicate disabling pain); Cruse, 867 F.2d at 1187 (holding that minimal consumption of pain medication reveals a lack of disabling pain); Rautio, 862 F. 2d at 179 (failure to seek aggressive treatment and limited use of

prescription medications is not suggestive of disabling pain).  The court finds that the ALJ properly

considered that Plaintiff did not consistently take prescription medication and that the ALJ's decision

in this regard is supported by substantial evidence and is consistent with the Regulations and case law.

Fourth,  the ALJ considered that Plaintiff worked after her alleged disability began and that

although it was not necessarily substantial gainful activity, it was indicative of Plaintiff's ability to

engage in work activity. (Tr. 16). "Acts which are inconsistent with a claimant's assertion of disability

reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148049 (8th

Cir. 2001).  "Working generally demonstrates an ability to perform a substantial gainful activity."

Goff, 421 F.3d at 792 (citing Nabor v. Shalala, 22 F.3d 186, 188-89 (8th Cir. 1994)). 20 C.F.R. §

404.1574(a) provides that if a claimant has worked, the Commissioner should take this into

consideration when determining if the claimant is able to engage in substantial gainful activity.

Moreover, when a claimant has worked with an impairment, the impairment cannot be considered

disabling without a showing that there has been a significant deterioration in that impairment during

the relevant period. See Dixon v. Sullivan, 905 F.2d 237, 238 (8th Cir. 1990).  As such, the court

finds that the ALJ properly considered that Plaintiff worked during the period she alleges she was

disabled and that the ALJ's decision in this regard is supported by substantial evidence.

Fifth, the ALJ considered that Plaintiff "had an inconsistent work history with minimal to no

earnings post for many years" which suggested that she had been unemployed for reasons other than

disability.  The ALJ held that this indicated a poor motivation towards work and concluded that

Plaintiff's work record did not reflect well on her credibility.  (Tr. 14-15).  An ALJ may discount a

claimant's credibility based upon her poor work record. Ownbey v. Sullivan, 5 F.3d 342, 345 (8th

Cir. 1993). See also Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996); McClees v. Shalala, 2 F.3d

301, 303 (8th Cir. 1993). The court finds that the ALJ properly considered Plaintiff's work history and that the ALJ's decision in this regard is based on substantial evidence.

Sixth, the ALJ considered that it was not necessary that Plaintiff be bedridden and that her daily activities which were inconsistent with subjective symptoms allegedly precluding all types of work would be considered. The ALJ noted that Plaintiff's daily activities included driving, bathing, dressing, grooming, watching television, playing Bingo, doing things around the house, preparing meals, caring for the family dog, folding clothes, attending church, attending club meetings, and shopping. The ALJ held that Plaintiff's activities were not consistent with allegations of a disabling medical condition. (Tr. 15). While the undersigned appreciates that a claimant need not be bedridden before he can be determined to be disabled, Plaintiff's daily activities can nonetheless be seen as inconsistent with his subjective complaints of a disabling impairment and may be considered in judging the credibility of complaints. Eichelberger, 390 F.3d at 590 (holding that the ALJ properly considered that the plaintiff watched television, read, drove, and attended church upon concluding that subjective complaints of pain were not credible); Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001); Onstead, 962 F.2d at 805; Murphy, 953 F.2d at 386; Benskin, 830 F.2d at 883; Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987). Indeed, the Eighth Circuit holds that allegations of disabling "pain may be discredited by evidence of daily activities inconsistent with such allegations." Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (citing Benskin, 830 F.2d at 883). "Inconsistencies between [a claimant's] subjective complaints and [his] activities diminish [his] credibility." Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir.2005) (citing Riggins v. Apfel, 177 F.3d 689, 692 (8th Cir. 1999)). See also Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Nguyen v. Chater, 75 F.3d 429, 439-31 (8th Cir. 1996) (holding that a claimant's daily activities including visiting neighbors, cooking, doing laundry, and attending church were incompatible with disabling pain and affirming

denial of benefits at the second step of analysis). The court finds, therefore, that the ALJ properly considered Plaintiff's daily activities upon choosing to discredit her complaints of debilitating pain. The court further finds that substantial evidence supports the ALJ's decision in this regard.

## VII.
## CONCLUSION

The court finds that the ALJ's decision is supported by substantial evidence contained in the record as a whole, and that, therefore, the Commissioner's decision should be affirmed.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Brief in Support of Complaint is **DENIED;** [17]

**IT IS FINALLY ORDERED** that a separate judgement be entered in the instant cause of action.

/s/ Mary Ann L. Medler
MARY ANN L. MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of November, 2006.